UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHSUETTS

| | |
|---|---|
| KELECHI LINARDON<br><br>Plaintiff,<br><br>v.<br><br>EXECUTIVE OFFICE OF HEALTH AND HUMAN SERVICES; KATE WALSH, Individually and in Her Official Capacity; MONTACHUSETT REGIONAL TRANSIT AUTHORITY; JERRY MCDONALD, Individually and in His Official Capacity; DOES 1 through X, inclusive, and ROE Business Entities I through X inclusive,<br><br>Defendants. | 1:25-cv-10772-WGY |

## DECLARATION OF REBECCA BADGLEY

Pursuant to 28 U.S.C. § 1746, I, Rebecca Badgley, hereby declare and state as follows:

1. I am over the age of 18 and have personal knowledge of all the facts stated herein, based on my own experiences as a former employee of Montachusett Regional Transit Authority ("MART"); as a current employee of the Human Service Transportation Office ("HST"), a division of the Executive Office of Health and Human Services ("EHS"); and based on conversations I have had with other current and former employees at MART and/or HST. If called as a witness, I could and would testify competently as to the matters set forth below.

2. This declaration is submitted in support of Defendant EHS's opposition to Plaintiff Kelechi Linardon's ("Ms. Linardon") request for entry of a preliminary injunction in this Action.

3. I am the Brokerage Liaison Manager at HST, and have been in that role since June 2023. Before joining HST, I was an employee at MART for 32 years, reaching the position of Brokerage Director, which I held for fifteen years.

4. In my role as Brokerage Liaison Manager at HST, I oversee the two brokers that provide transportation services to EHS under contract, including MART.[1] I ensure that MART operates within the guidelines of its contract with EHS. This includes following up on critical incidents reported to HST, overseeing billing matters, and resolving transportation issues.

5. In my previous role as Brokerage Director of MART, I oversaw the operations of MART's brokerage department, including transportation provided for specific programs such as the Department of Mental Health or the Department of Early Childhood Intervention, as well as "demand response" transportation, which consists of scheduling and managing non-emergency medical transportation for consumers that have an approved MassHealth Prescription for Transportation ("PT-1").

## Relationship Between HST and MART

6. HST does not provide demand response transportation directly to consumers. Instead, EHS has a contract with MART,[2] and MART then subcontracts with many vendors. These vendors then provide transportation for qualified MassHealth individuals who receive a PT-1 from their care provider for purposes of getting to non-emergency medical appointments.

7. Any MassHealth provider can submit a PT-1 request on behalf of a consumer, who can qualify for a PT-1 for a variety of reasons, including not only medical necessity, but also, e.g., geographical distance from the care provider or lack of public transit. The PT-1 application is processed by MassHealth for approval. Once approved, the PT-1 is sent to MART, which handles individual transportation services through its subcontracted vendors.

---

[1] The other broker that has a contract with EHS is Greater Attleboro and Taunton Regional Transit Authority ("GATRA"). Both brokers are established and governed by Massachusetts statute, M.G.L. c. 161B.

[2] EHS and MART entered into a contract on April 1, 2021, with an implementation date of July 1, 2021. That Contract has since been amended eight times, most recently on August 9, 2024. The original Contract, which is still in effect albeit with minor amendments, is attached hereto as Exhibit A.

2

8.  MassHealth PT-1 transportation is usually "curb-to-curb," meaning that each consumer is expected to get themselves to the vendor's vehicle once it arrives. If needed, an individual can have an escort or a personal care attendant ("PCA") to assist them.[3]

9.  Some of the subcontracted vendors are livery companies that utilize standard vehicles, such as sedans and taxi cabs. Other vendors have "wheelchair vans"—accessible vehicles that include a ramp or a lift, are configured to hold several wheelchairs, and provide ambulatory seating. Vendors with wheelchair vans are often referred to as "chair-car" providers (a "chair-car" is a term for a wheelchair).

10. Pursuant to the contract between EHS and MART, demand response subcontracted vendors must satisfy an extensive set of qualification requirements, trainings, and ongoing performance standards—both for drivers and vehicles. [*See* Ex. A, Contract, at 98–114 (Appendix 1, Sections 4–7)].[4] For example, vehicles must be garaged and registered in Massachusetts, be clearly identifiable with corporate or business names, and be maintained and cleaned regularly. Drivers must be licensed in Massachusetts, complete a Criminal Offender Record Information ("CORI") check, and be able to assist consumers in entering and exiting the vehicles.

11. MART has close to 300 subcontracted vendors and provides over 35,000 one-way trips a day for PT-1 consumers.

---

[3] MassHealth also offers "door-through-door" services, called "enhanced chair-car service," which is often provided by ambulance companies and utilized by consumers who are leaving the hospital or who reside in nursing home facilities. PT-1 consumers that seek enhanced chair-car service must check a box on the PT-1 application form.

[4] As noted, the EHS-MART Contract has been amended on a regular basis since its formation in 2021. While the original Appendix 1 is technically no longer in effect, amended versions of that Appendix—which are largely the same as the original one—remain binding on MART and all its subcontractors.

12.     In nearly all cases, consumers using a motorized scooter utilize a chair-car. They can then opt to stay in their scooter, which is fastened to the floor of the vehicle, or move to one of the ambulatory seats.

### MART's Historical Interactions with Ms. Linardon

13.     Ms. Linardon is an approved PT-1 consumer. She has been using HST's demand response transportation services, through MART and its subcontracted vendors, for over a decade.

14.     Ms. Linardon uses a motorized scooter, which is heavier than a standard folding wheelchair, walker, or rollator. The scooter also does not fold and is tricky to disassemble, unlike most standard folding wheelchairs, walkers, or rollators.

15.     Ms. Linardon has consistently requested services beyond what the PT-1 guarantees and that are outside the scope of the transportation services provided pursuant to the contract between EHS and MART.

16.     Ms. Linardon demands that she ride in a large sedan or SUV, not a minivan; sit in the front seat of the vehicle; and have the car to herself, with no other passengers sharing the ride with her. Ms. Linardon also demands that the vendor-driver take apart her motorized scooter and lift the parts into the vehicle, and then again lift the scooter out from the vehicle and reassemble it at her destination. Ms. Linardon refuses to ride in a chair-car.

17.     Historically, a small subset of MART vendors could meet Ms. Linardon's particular demands and chose to do so. For example, one vendor-driver had a Toyota RAV4, and the driver agreed to assist Ms. Linardon with her scooter. None of these vendors were ever required to meet Ms. Linardon's demands under the contract between EHS and MART.

18.     However, over the past few years, it has become more and more difficult for vendors to accommodate Ms. Linardon's requests. Only certain subcontractor vendors have large

sedans or SUVs in their fleets, as opposed to smaller sedans, smaller SUVs, minivans, or chair cars. Some vendors have policies that passengers cannot sit in the front seat next to the driver. Many of the rides are shared, because driver-vendors conduct multiple pick-ups and drop-offs during a single trip. Disassembling and reassembling Ms. Linardon's scooter is physically demanding and difficult—the driver must take the seat off the scooter, fold the bottom piece, lift both parts into the vehicle, and then reverse this process at the destination.

19. In light of Ms. Linardon's demands, it has become exceedingly difficult to find any driver or vendor willing to provide transportation services to her. Out of MART's nearly 300 subcontracted vendors, only a handful are willing to consider transporting Ms. Linardon.

20. MART and HST cannot require that any vendor meet Ms. Linardon's demands because they exceed the scope of the EHS-MART contract and are outside the scope of the offerings MART has subcontracted with its vendors to provide.

21. MART is the primary entity that interacts with PT-1 consumers; HST has had limited communication with Ms. Linardon. However, both HST and MART have repeatedly communicated to Ms. Linardon that while her personal demands usually cannot be met, she can always take advantage of the standard services available to her through the PT-1. This includes curb-to-curb wheelchair van services, as well as the option to bring her own escort or PCA to assist her with some of her specific requests.

22. By way of example, I include with this declaration a true and accurate copy of my correspondence with Jerry McDonald, Assistant Director of Member Services at MART, about Ms. Linardon's circumstances. [*See* Ex. B, Email Chain Between Badgley and Jerry McDonald]. As that exchange shows, despite our best efforts to explain the situation to Ms. Linardon, she insists on receiving services from vendors that are not available in the ordinary course to PT-1 customers.

23. Ms. Linardon remains an approved PT-1 consumer. She can access any of the services that HST, MART, and the subcontracted vendors offer.

I declare under penalty of perjury that, to the best of my knowledge, the above is true and correct.

Executed this 6th day of May, 2025.

*Rebecca Badgley* (signature)
Rebecca Badgley

## BADGLEY DECLARATION EXHIBIT INDEX

| Exhibit | Description |
|---------|-------------|
| A | Contract for Non-Emergency Human Service Transportation Broker Services by and Between the Executive Office Of Health and Human Services and Montachusett Regional Transit Authority |
| B | Email Chain Between Rebecca Badgley and Jerry McDonald |